```
                     United States District Court
                       District of Massachusetts
_____
                                )
UNITED STATES OF AMERICA        )
                                )
         v.                     )
                                )   Criminal No.
FRANCISCO BRITO,                )   09-10103-NMG
                                )
         Defendant.             )
_____)
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Defendant Francisco Brito ("Brito") is charged with 1) conspiracy to possess heroin with intent to distribute in violation of 21 U.S.C. § 246 and 2) separate counts of possession of cocaine base, cocaine and oxycodone with intent to distribute, all in violation of 21 U.S.C. § 841(a)(1). He has moved to suppress evidence discovered during a search of the apartment at 116 Foster Street in Peabody, Massachusetts in which he allegedly was living. Defendant asserts that the search warrant was not supported by probable cause.

**I.   Background**

   **A.   Factual Background**

The following facts are drawn from the affidavit of Special Agent Christian Brackett ("Brackett") of the Drug Enforcement Administration ("DEA"), upon which the search warrant at issue was based. Brackett is a 12-year veteran of the DEA currently

assigned to the Boston Office of the New England Field Division. During the course of his career and prior to this investigation he has participated in over 100 narcotics trafficking investigations.

The affidavit related to two residences and three co-conspirators but only one residence, 116 Foster Street, Apartment 1, and one defendant, Brito, are at issue here.  Probable cause was based primarily upon two occurrences.  First, on March 1, 2009, alleged co-conspirators Gina Machuca ("Machuca") and Moises Abad ("Abad") spoke over a cellular telephone that was under authorized wire surveillance.  Abad told Machuca that when Machuca went to talk to "P" the next day, she should take "the thing, the GPS".  At about Noon the following day, the same co-conspirators exchanged several text messages.  Abad told Machuca that "'P' says to come down".  Machuca asked what floor and Abad told her "1".  Shortly thereafter, surveillance agents located Machuca's automobile, a gray 2004 Nissan Maxima, parked and unoccupied in front of 116 Foster Street.  Subsequently, Abad and Machuca exchanged additional text messages, including one from Abad instructing Machuca to "Give him 10 pesos".  At about 1:37 p.m., surveillance agents observed Machuca walk out of the 116 Foster Street apartment house to her car, retrieve a GPS device and return to the residence.

Machuca left the apartment at 1:43 p.m and called Abad ten

minutes later.  Referring to the person she had just met as "Alex", Machuca complained that he "does not know what he is doing."  She described discussions with "Alex" about how better to keep track of who owes him money and how much.  Machuca ended the conversation saying that she was "going to return the money now."

Based upon his observations, training and experience, Brackett believed that the described transactions were part of a narcotics conspiracy.  In light of evidence that Brito lived at 116 Foster Street, Apartment 1, Brackett also believed that "P" and "Alex" both referred to Brito.  Moreover, because Brito was a relatively new courier, Brackett understood that 1) Machuca had been instructing Brito about making a record of debts customers owed for narcotics, 2) the GPS device "may [have] contain[ed] names and addresses of those associated with the conspiracy, including customers," and 3) statements about "10 pesos" and returning the money referred to drug money for the conspiracy.

In addition to his description of the interaction with Machuca, Brackett's affidavit also describes a so-called "illustrative example" to show that Brito's residence at 116 Foster Street was used to facilitate drug trafficking. Specifically, on March 3, 2009, a cooperating witness ("CW") allegedly purchased 12 grams of heroin from Abad through Brito. At 11:46 a.m., the CW called a phone number used by Abad.  After

placing an order for heroin, Abad said that he would "call this guy" and then call the CW back. At 12:32 p.m., the CW received a call from a number with no subscriber information ("the courier's number"). The affidavit states that a "male, later identified as Brito" introduced himself, asked for the CW's address and reported that he would leave right away. The CW then sent a text message to the courier's number with his address.

At 12:45 p.m., the CW placed another call to the courier's phone. He asked for his name and was told "Uh, Perez". The CW then asked what kind of car he was driving and was told a creamy gray BMW. At about the same time, surveillance agents observed a brown BMW, registered to Brito, parked behind 116 Foster Street. A few minutes later, agents watched the BMW leave 116 Foster Street with one male occupant and, about one half-hour after that, pull into the CW's driveway. Brito was videotaped meeting the CW in the driveway, entering the residence with him and subsequently leaving. After Brito left, Agent Brackett and another agent retrieved 12 grams of heroin from the CW, which had been purchased for $800.

Based upon the foregoing information, United States Magistrate Judge Marianne Bowler signed a search warrant for 116 Foster Street, Apartment 1 on March 4, 2009. The warrant was executed that evening and among the items found were drugs and cash.

### B. Procedural History

A criminal complaint issued against Brito on March 5, 2009 and an indictment was handed down on April 15, 2009. Brito filed the pending motion to suppress September 30, 2009 to which government has filed a timely opposition.

## III. Analysis

### A. Legal Standard

A warrant application must demonstrate probable cause to believe that 1) a crime has been committed (the commission element) and 2) particular evidence of the offense will be found at the place to be searched (the nexus element). United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005). Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found at a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A prior judicial determination of probable cause is entitled to great deference by the reviewing court. Id. In considering the sufficiency of an affidavit, a court must determine whether the "totality of the circumstances" presented demonstrate probable cause. United States v. Strother, 318 F.3d 64, 67 (1st Cir. 2003).

### B. Application

Brito contends that the warrant authorizing the search of 116 Foster Street, Apartment 1 was not supported by probable cause and that the so-called "good faith" exception is

inapplicable to that search.

### 1. Probable Cause

Brito maintains that probable cause to search 116 Foster Street was lacking because the affidavit in support of the search warrant failed to establish a nexus between that address and his alleged drug trafficking. Moreover, he asserts that there was no probable cause even to believe that 116 Foster Street was his residence, thus further undermining the nexus element.

The First Circuit Court of Appeals has held that probable cause to suspect that someone has committed a crime does not automatically give rise to probable cause to search that person's home. See United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999). Nevertheless,

> interpreting a search warrant affidavit in the proper commonsense and realistic fashion may result in the inference of probable cause to believe that criminal objects are located in a particular place, such as a suspect's residence....

Id. (internal quotation marks and citation omitted). In some circumstances the nexus between the crime and the location to be searched

> can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].

Id. (alteration in original) (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)).

In upholding searches of a drug suspect's residence, the

-6-

First Circuit has relied on a number of considerations including:

1) the affiant's statement, drawn from his or her training and experience, that drug traffickers frequently use their homes for storing cash and records associated with their business; and

2) evidence that the suspect traveled directly from his or her residence to the location of drug transactions, or that the suspect worked out of the home.

United States v. Thompson, 630 F. Supp. 2d 138, 143 (D. Mass. June 3, 2009) (citing cases).

Assuming, for the moment, that police had probable cause to believe that 116 Foster Street, Apartment 1 was Brito's residence (a point to which the Court will return), the Court first considers whether the affidavit established a nexus between Brito's alleged drug trafficking and that address.

### a.  Nexus with 116 Foster Street, Apartment 1

Defendant's argument for suppression focuses on distinguishing several cases.  In contending that this case is different from the facts described in Thompson and other cases, Brito emphasizes that 1) he was not seen leaving the residence at Apartment 1 directly but just the apartment house at 116 Foster Street, 2) no extensive surveillance of him was conducted and 3) he was a rookie courier without past known associations or any history as a dealer.

Brito's arguments are unavailing.  As the government notes, two factors described in the Thompson opinion are consistent with our facts.  First, Brackett's affidavit states that, based upon

-7-

his training and experience, he believed that records and evidence of drug trafficking would be found in the residence. Moreover, agents observed Brito leave 116 Foster Street, travel directly to the residence of a CW and sell him $800 worth of heroin. Second, the affidavit presents direct evidence that both record keeping and monetary proceeds were found in the residence. With respect to record keeping, Machuca talked at length with Abad about Brito's deficient records and her instructions to him about tracking debts owed. Moreover, text messages exchanged while Machuca was inside 116 Foster Street, Apartment 1 and her conversation with Abad afterwards indicated that money was exchanged. Machuca was told to pay Brito "10 pesos" and she said, after leaving Brito's apartment, that she was "going to return the money now."

Brito's relatively short history with drug trafficking does not alter this analysis. To be sure, the Thompson decision and other cases have identified long-term and large-scale trafficking as relevant to establishing a nexus under the probable cause calculus. That is not, however, dispositive.

> [W]hile evidence of long-time trafficking may increase the odds that inculpatory material exists at a dealer's residence (because, presumably, such material accumulates over time), lack of evidence of long-time trafficking does not eliminate the nexus.

United States v. Pina, No. 00-cr-10208 (PBS), 2003 WL 21212735, at *3 (May 21, 2003).

It is well-settled law that, with respect to the issuance of warrants, the magistrate judge's determination is entitled to great deference. United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). Here, the Court finds ample support for deferring to the determination that Brackett's affidavit was sufficient to demonstrate a nexus between 116 Foster Street, Apartment 1 and drug trafficking.

### b.   Proof of Residence

Brito attempts to bolster his argument with the contention that the subject affidavit provides no corroboration linking his name to the residence searched. His position is unfounded. To begin, the affidavit states that Brito told his probation officer on January 27, 2009 that he resided at 116 Foster Street, Apartment 1. Although that assertion alone should be sufficient, surveillance and intercepted conversations confirm Brito's address. Despite the fact that the individual at the apartment was referred to as "Perez" or "P" (and once, "Alex") in conversations, the affidavit makes clear that "Perez" is Brito. In particular, after Brito identified himself as "Perez" on the phone with the CW, he was videotaped at the CW's residence. Agent Brackett and another agent subsequently identified the individual in the video as Brito even though he had told the CW that his name was Perez.

Consequently, the Court concludes that the warrant to search

116 Foster Street, Apartment 1, Peabody, Massachusetts was supported by probable cause and defendant's motion to suppress will be denied.

### 2. The "Good Faith" Exception

Even were this Court to conclude that probable cause was lacking, the search in this case falls well within the parameters of the so-called "good faith" exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897, 922 (1984) (holding that objectively reasonable reliance on a subsequently invalidated search warrant does not justify exclusion of evidence obtained pursuant to that warrant). The warrant in this case was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." See id. at 923 (quoting Brown v. Illinois, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)). Nor is there any evidence that the Magistrate was not neutral and detached. Id. at 926.

Brito's short argument against applying the good faith exception fails to make any reasonable assertion to the contrary. Rather, he contends only that

> requiring police to have a reasonable amount of evidence prior to issuing a warrant is crucial in upholding the [F]ourth [A]mendment. Allowing police to obtain warrants [otherwise] goes against the purpose of the [F]ourth [A]mendment, especially in protecting the most important structure, the home.

In resorting to such a vague contention about Fourth Amendment policy, Brito all but admits that his position lacks merit. The

-10-

officers' good faith reliance on the magistrate judge's finding of probable cause in this case is exactly what the good faith exception permits.

**ORDER**

In accordance with the foregoing, the defendant's motion to suppress (Docket No. 36) is **DENIED**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated December 2, 2009